Today is 2017-2171 Uniloc v. Picis. Mr. Mangrum, please proceed. Good morning, Your Honors. May it please the Court. The District Court misapplied the two-step eligibility analysis reiterated analysis. I want to just spend a minute highlighting some points in the briefing. So under Step 1 of ALICE, the District Court erred in reducing the claims to an untethered abstraction that more closely resembles the disparaged prior art than the claim language. And it's helpful taking a look at the background section of the combined specification at issue. The patents and suits both were filed in 1995. I'm correct, they've both now expired? They are both expired, and they both were filed mid-year 1995, that's correct. That date is actually important, Judge Walsh, because Uniloc's papers talk about the state-of-the-art as set forth in the background section, but also as set forth in the EnFISH patents, which is a contemporaneous patent, and those patents were contemporaneous, also filed mid-year 1995. So that date's important. In the red brief in 19, Pisces, I think I'm saying that right, argues Uniloc's, I'm quoting, Uniloc's flexibly enabling description, and they have that in quotes, flexibly enabling, is absent from the language of the claims and specifications of 526PAT. Where can we find that flexibly enabling language? Thank you for drawing my attention to that. You're welcome. The flexible language is actually in the titles of the patents. It's in the abstract. It's shorthand in the patent for the user-controlled nature of the claims. And so when you want to look for the flexible aspects residing in the claim… But my question was, where can we find it in the claims and specification? Yeah, so I'm drawing the Court's attention to the user-controlled language in the claim. And so let's look at a specific in Claim 1, for example. Sure, cite us to a page, please. This is in the appendix of 132. Okay. And in that, that draws us to the claims themselves. Starting at column 12, lines 41 through 46, you have the preamble of Claim 1. And in the preamble, it says, A method in a computer system for designing under the control of a user a patient information hierarchy. So you have, at the outset of the claim, this thematic invocation of what's happening is a user is controlling the design of the structure of the hierarchy. Flexibly enabled. So that is the flexible. The flexibility comes from enabling a user to do this. And the specification distinguishes the user control from prior databases that the specification refers to as general-purpose databases and rigid patient information databases. The distinction the specification makes is the user is not able to go in and control new design for the structure. And so that's why I'm drawing your attention to the under the control of the user. So the prior art was a database that was programmed by some kind of software designer or the like, and couldn't be altered. Once it was set, it could not be altered. That's why it was called a rigid patient information database. The advancement here is the user can program the database. Virtually any user can go in, regardless of the state of the database, can go in and change it. And the Claim 1 requires a very specific change. Claim 1 requires introducing new fields or parameters. So this is not recording raw data. This is changing the structure of the database. And then when you look at Step F, which is the last step of Claim 1, there is a reference to linking. So what happens is the claim goes through a process of receiving user input. It implements that process in Step F as creating a link, and I'm going to quote from the claim language, within the patient information hierarchy. So that's important. The link, the logical model of the linking is within the hierarchy itself. And the reason why that's important is because it's evocative of some of the analysis set forth in ENFISH. What is the user doing that couldn't have been done by a software designer? Well, the software designer goes in and sets up a database not to enable change, but just to enable the software designer has to go in and envision what exactly what the database needs to be for all purpose, right? For any particular customer. Sure, and your invention is the user can customize it. Right, and you can imagine. Is there any difference in that activity? I mean, suppose a hospital is running this software and keeps a software designer on staff because it knows it's going to want to adapt this database. Is that software designer doing customization any different than the user doing customization? Yes, and the reason we know that is because of the specific process set forth in Claim 1, for example, or Claim 4 would be another example. This is an ordered process where... Are you saying a software designer on staff couldn't customize it in the same way a user could? No, what I'm saying is the claim language requires receiving input and responding to input. So it's evocative of an interface describing specification. The patent provides a way, it's essentially improving the computer system itself by enabling a user to go in and provide simplistic input and then the software then takes that and does restructuring of the database structure. Let me turn your attention to the 451. In the blue brief at 4041, you discuss the formula construction subsystem that includes a three-part algorithm, and you say it involves identifying certain values, applying the selected function, and manipulating the single value. Are all the possible functions preloaded on the software? Possible functions meaning functions that the user can... Identifying certain values, applying the selected function, manipulating the single value. So the software, when you go to the specification, the software talks about providing... I'm going to right now after you answer my question. Okay, so the software provides a user interface. It's a graphical user interface that has a number of options. You know, logic less than, greater than, equal to, some multiplication things, and then ways to concatenate text together. So the user, even if they don't know any programming, what they're able to do is at least say I want the software, the formula to operate like this. I can't generate the code to actually set up a formula that creates new data. What I can at a minimum do, I want it to do this. Then the software then goes in, and the software piece is called the formula construction subsystem. So that's a piece of software that is... Okay, you're not approaching what I want. Let me go into specifics. The specification explains that figure four represents a screen diagram that contains a, I'm quoting, manipulator area 430 that contains buttons that the user may use to insert value manipulators. That's where you were going, right? Such as operators and functions into the formula at the insertion point. And you refer to the 451 column for line 14 and lines 52 to 54. When I turn to figure four manipulator area though, through which a user adds functions to construct a formula, it includes generic mathematical functions such as addition, subtraction, and converting a number into a percentage. What portion of those generic mathematical functions is inventive? The patent doesn't report to invent the idea of using addition on a computer. It's the combination of providing an interface that's simplistic enough for virtually any user to at least tell the computer, I want this piece added with this piece or this time index data. Over a portion of time, I want the greatest heart rate over a portion of time. So the user uses the interface that you're talking about. I don't know if you'll know the answer to this, but when did the first programmable calculators come out on the market? Well before 95, right? I'm not sure that's in the record. I have no idea, but if you're asking for calculators that have buttons or calculators that are programmable. Programmable calculators. My background was in Texas Instruments. From Texas Instruments. Yeah, I did work at Texas Instruments for a while, but I don't know the answer to that for sure. I was an engineer there for a while. I don't want to, you know, create the record, but when I was in high school in the 80s, I'm pretty sure I was using programmable calculators. So I think the important thing to recognize here in the claims is that it's not directed to a programmable calculation. It's the idea that you get to have an interface that allows users to provide a string of characters or instructions. It's essentially an input, like a keyboard, and then the software goes in and creates the logic necessary, the coding necessary to apply that information. So it takes basic commands and you have a menu of basic commands, like add or greater to or things like that, and the interface transforms that into code. Right, and then, yes, and it creates what the claim calls a formula, and it's important to recognize in the claim language itself, it says the formula is not application of direct input. It's not. The formula is something beyond the input. What portion of the claim language explains how a formula is constructed besides a user constructing the formula themselves? That is, what does the computer contribute to this process besides allowing a user to create a formula and then store it? So let's refer to Claim 10, for example. Can you give us a page reference? Sure. So in Appendix 154, there appears Claim 10 of the 451 patent. Okay, go ahead. And the thing I want to point out is there is an input device, that's starting at line 36, coupled to convey the formula construction subsystem from the user, different pieces of input, and the input's specific. So there's three specific pieces of input that we're looking for in the context of this claim. It's not just any input in general. So there's three pieces of input identified. After that, after you receive the input, then there's this memory component, and it's important here to recognize that the memory, coupled to the formula construction subsystem to store a formula, and then here's the language I want you to focus on, is constructed by the formula construction subsystem. So the claim language is very specific, that you have input that's provided, three pieces of specific input, and after you receive the input, the formula's not done. The formula is not the input. The formula construction subsystem explicitly set forth in the claim must be the thing, the software, that constructs the formula. And that's our point. Now, how that is done is set forth in the specification. The claims don't need to themselves be enabling. I should admit, state though, that this specific claim language appeared in the original application. This wasn't added by amendment. So these ideas that the formula's constructed by the formula construction subsystem and not the user appeared as claim language in the original specification. But how that is to be accomplished, as far as taking the input and then constructing the formula, is set forth, that's an enablement question within the specification. We don't feel that's a one-on-one question in terms of whether or not the claim recites something more than the alleged abstract idea. Do you wish to save any of your time for rebuttal? Yes, I'd like to save five minutes. Well, you've already used most of that. Okay, let me save the remainder of time. Thank you. Thank you, Your Honors. Let me just briefly address some of the questions that were raised during the appellant's presentation. First of all, the preloaded functions are not claimed by the 451 patent. And if you look at claim 10, and this is at the appendix page 154, the steps of the formula construction subsystem that were described are basically the input, I should say. Input from the user selecting from a displayed list of time-indexed medical value names, a displayed list of time intervals, and a displayed list of functions, all of which come preloaded into the software, none of which are claimed in the patent. Second, there was a reference to flexibility. I think it's undisputed that in the 526 patent, there is no reference in the claims to flexibility. Instead, what Unilock is arguing is that by having a user control the organization of the data by just basically inputting the instructions onto a general-purpose computer, that will provide more flexibility over the preprogrammed databases that Your Honor mentioned. That's just inherent in having anybody input the data structure themselves. There was also a reference to the state-of-the-art, and I just want to make one point clear on that. It is undisputed that the 526 patent and the 451 patent could be performed on any computer system at the time in 1995, and we know that because the specifications explicitly state that computer system as used throughout the patent means a general-purpose computer. Unilock admitted to the district court that the claims could be practiced on any general-purpose computer. That admission is at page 259 of the appendix, and it is quoted or cited by the district court at page 5 of the appendix in its decision. So there's really no dispute that the state-of-the-art allowed the conventional processing steps that are functionally claimed in these patents. There's also a reference to linking, for example, as perhaps the inventive concept in the 526 patent. As the district court properly recognized, there is no description in the claims or in the specification for how that step is to be accomplished because the claims treat it as a purely functional limitation that is assumed to be performable on any general-purpose computer at the time. And that is true for all of the limitations in these claims, and what you're left with is, with respect to the 526 patent, the abstract idea of organizing patient data into a hierarchy, which Unilock admits there is no claim that the patent's invented, and putting it on a general-purpose computer. And the limitations of the claims in the 526 patent are insufficient under this court's precedent and under the Alice Supreme Court decision to impart an inventive concept because they provide purely functional limitations that can be performed on any general-purpose computer. Unilock's argument appears to be that because this was an advance over the prior art, that that is sufficient to impart an inventive concept. That is not the test. Alice makes clear, and this court's precedent confirms, that it is not whether the patent as a whole is an improvement over the prior art. It's whether if you take the abstract idea out of the claims, whether the other claim limitations are sufficient to impart an inventive concept drawing them out of the realm of an abstract idea. And that is not the case here. This case is also very unlike Enfish in a couple of important ways. The first is that Enfish claimed to invent a first-of-its-kind self-referential logic table that not only improved how databases function, but thereby improved the functioning of computers. Unilock admits that these patents do not claim to have invented hierarchical data structures. Instead, what they claim to have invented is the implementation of those structures on a computer to organize medical information. That's very different from Enfish. Furthermore, in Enfish, you had a specific algorithm for how to create that table, and how to create that self-referential table, which you don't have here remotely. And lastly, and I think this is key, the patents do disparage the prior pre-configured databases as being potentially unfit or not perfectly workable for medical practices. However, the 526 patent is primarily focused upon the maintenance of patient information in physical charts. The patent does disparage the then-existing commercially available alternatives to automate patient information, but as the district court properly recognized, that does not recast the patents as a solution to problems rooted in computer technology. The only thing these patents teach is take the abstract concept of organizing patient data in a hierarchy in the 526 patent, and then implement it on a general-purpose computer using routine processing steps, like receiving instructions, displaying selected functions, linking them to particular fields of patient information. So there's nothing in the 526 patent other than that abstract idea implemented on a general-purpose computer. In the 451 patent, the abstract idea is using and constructing formula for medical information. And let's focus on one last point, and that is this concept of a formula construction subsystem. Unilock's primary argument on appeal with respect to the 451 patent is that the district court improperly overlooked the formula construction subsystem. That is incorrect. The court did not specifically use those precise words, but it did address Unilock's argument that that was sufficient to impart an inventive concept. And the point that I just want to raise here is that, first of all, the formula construction subsystem is only found in the apparatus claims, 7 and 10. And even in those claims, the formula construction subsystem is just generically described as software that can perform the methods described in the earlier patent-ineligible method claims, which Alice teaches cannot save the claims by merely recasting them as an apparatus. And as we've previously discussed, the formula construction subsystem merely involves the application of preloaded programmed functions, which, again, the patent does not claim, selected by the user and applied to the medical information and the inputs provided by the user. Unless Your Honors have any other questions. Thank you. Thank you very much. Thank you. Mr. Mangrum, you have some rebuttal time. You misspoke. He meant any questions. Oh, I'm sorry. Thank you. You also misspoke. You can never tell a court, lastly, then keep going, and then say one final point. You already made your final point when you said lastly, so just be a little cautious of that because, you know, it's like telling a hungry person that there's food coming and then not getting it. Understood. Thank you, Your Honor. Okay, I'd like to address two points they made just now. One is the Unilock never said that there was a special-purpose computer. We've cited in our briefing to the Aon Corp case where when you have software loaded onto a general-purpose computer, it in effect becomes a special-purpose computer. That's what the specification says. It distinguishes its invention from general-purpose computers because there is new software that facilitates the type of interaction with the computer, user interaction that enables the claims. And so it is not... You can't look at the specification and come to the conclusion that the specification is nothing more than what was done on general-purpose computers because the specification doesn't allow you to. And if I draw Your Honor's attention, the point we're both referencing is the very latter part of the background section of the 526 patent specification. So, again, there's a distinguished... express distinguishment. The patent expressly distinguishes the general-purpose databases from its invention. Second point, when they say this is not like ENFISH, I want to address that. There are several reasons why this patent is like ENFISH. And when you look at Figure 4 of the patent, of the 526 patent, there is... Give us a reference, please. Sure. 109. Yes, thank you, 109. What you have there is a parameter definition table. And in the parameter definition table, there's a description of how you have self-referential logical models within the table. So, in Claim 1, it addresses the description, corresponding descriptions with the first row, the top row. In Claim 1, you create a new parameter, COF, and then you have link-to parameters, 10013 and 10014. You know they're link-to parameters because of what's included in Column 403. It says yes. So, that column, 403, provides a definition that is then used self-referentially in Column 406 to define what that information means. If you look at ENFISH, it's very, very similar. Now, ENFISH said that there was no user... I recognize I'm out of my time, but my point is I want to draw Your Honor's attention to the description. And our papers brief us extensively on why that figure proves that there's a correlation with the ENFISH analysis that should apply here. Okay. Thank both counsel. The case is taken under submission.